

JS6
Send
LINK: 29

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WENDY SCALLION, | Case No. CV 05-6849 GAF (PLAx) |
| Plaintiff, | |
| v. | ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| CITY OF HAWTHORNE, public entity, et al., | |
| Defendants. | |

## I.
## INTRODUCTION

On September 19, 2003, Plaintiff Wendy Scallion was riding her bicycle in the City of Hawthorne when she was stopped by Hawthorne Police Officer Melanie Newenham and Reserve Officer Renee Descant. Even though it was well after sunset at the time, her bicycle headlight was not on, constituting a violation of California Vehicle Code § 21201(d)(1). Scallion was also not carrying any identification, and she did not answer the officers' requests for her name. She contends that the officers arrested her solely because she asked whether she was

under arrest. Defendants, on the other hand, contend that Scallion did not have any identification on her and refused to give them her name. Scallion also alleges that Officer Newenham unlawfully searched her on two occasions, one at the scene by rifling through her pockets, and again by lifting up her jacket-type shirt and exposing her breasts while booking her at the police station. Though Scallion was cited for various violations of the California Vehicle Code and Hawthorne Municipal Code, the prosecuting attorney did not file any charges against her.

On March 17, 2006, Scallion filed a Second Amended Complaint ("SAC") against the City of Hawthorne (the "City"), Hawthorne Police Department (the "Police Department"), Chief Stephen E. Port of the Police Department, Officer Newenham, and Officer Descant (collectively "Defendants"). The City of Manhattan Beach and Officer Gary Dusyn were also named Defendants, but were voluntarily dismissed on November 6, 2006. In the SAC, Plaintiff alleges causes of action pursuant to 42 U.S.C. § 1983 for violation of her First Amendment rights, illegal search, wrongful detention/false arrest, and malicious prosecution.[1]

On October 23, 2006, Defendants moved for summary judgment, contending that the officers had probable cause to detain and arrest Scallion and that Scallion could not establish Monell liability. As explained in greater detail below, the Court **GRANTS** the motion in its entirety.

II.

**STATEMENT OF FACTS**

On September 19, 2003 at approximately 8:00 p.m., Scallion was riding her bicycle along Doty Avenue near 139th Street in the City of Hawthorne. (Pl.'s Separate Statement of Genuine Issues ("SGI") ¶¶ 1, 3.) Officers Newenham and Descant were patrolling in the same area and saw Scallion riding her bicycle. (Id.)

---

[1] At oral argument, Plaintiff's counsel suggested that the SAC also contained state law causes of action based on the California Constitution. However, the SAC contains only causes of action pursuant to 42 U.S.C. § 1983.

2

1   That day, sunset was at 6:55 p.m., and the end of civil twilight was at 7:20 p.m. (Id. ¶

2   2.)[2] Because the officers' encounter with Scallion occurred well after civil twilight,

3   they could readily observe that Scallion's bicycle headlight was not turned on, in

4   violation of California Vehicle Code § 21201(d)(1). (Id. ¶ 4.) The officers also

5   determined that Scallion also did not have a Hawthorne bicycle license affixed and

6   displayed on her bicycle, as required by Hawthorne Municipal Code § 10.76.010.[3] (Id.

7   ¶ 7.) Upon seeing Scallion, the officers stopped their patrol car and walked over to

8   her. (Cook Supp. Decl. Ex. J [Scallion Dep.] 59:4-21.)

9       At the time the officers approached her, Scallion was not carrying any

10   identification. (Id. ¶ 8.) Scallion also did not give her name to the officers. (Id. ¶ 9.)

11   Subsequently, the officers placed Scallion under arrest, handcuffed her, and placed

12   her in their patrol car. (Newenham Decl. ¶ 13; Scallion Decl. ¶ 6; SGI ¶ 11.)

13       Scallion was later transported to the Hawthorne Police Department for

14   booking. (SGI ¶ 11.) At the time, Scallion was wearing baggy "pedal pusher" pants

15   and a baggy zip-up "jacket-type" shirt. (Id. ¶ 15.) While being booked at the station,

16   Scallion was asked to remove all body piercings. (Id. ¶ 12.) She stated that she had

17   a bellybutton ring, but did not know how to remove it. (Id. ¶ 13.) After the bellybutton

18   ring issue was raised, Officer Newenham approached Scallion and lifted up Scallion's

19   shirt by the bottom left corner. (Id. ¶¶ 14, 16.) Upon lifting the shirt, Scallion's bare

20   breasts were exposed because Scallion was not wearing any clothing underneath the

21   shirt. (Id. ¶ 18.) Officer Newenham did not touch or fondle Scallion's breasts. (Id. ¶

22

---

23   [2] The Court takes judicial notice of a print-out from the U.S. Naval Observatory web site,
indicating the sunrise, sunset, and twilight hours on September 19, 2003 because this fact is
24   "capable of accurate and ready determination by resort to sources whose accuracy cannot
reasonably be questioned." Fed. R. Evid. 201. According to the web site, civil twilight ends in
25   the evening when the center of the sun "is geometrically 6 degrees below the horizon. This is
the limit at which twilight illumination is sufficient, under good weather conditions, for terrestrial
26   objects to be clearly distinguished. . . . [I]n the evening after the end of civil twilight, artificial
27   illumination is normally required to carry on ordinary outdoor activities."

28   [3] The Court also takes judicial notice of Hawthorne Municipal Code § 10.76.010. Fed. R. Evid.
201.



22.) Scallion's shirt was then lowered and another female officer removed Scallion's bellybutton ring. (Id. ¶ 23.)

Hours later, Scallion signed a written promise to appear and was released from custody. (Id. ¶ 27.) She was cited for various violations of the California Vehicle Code and the Hawthorne Municipal Code, but the prosecuting attorney declined to file any charges against her. (Id. ¶ 28; Cook Decl. Ex. B [Notice to Appear].) She was not cited for violating the headlight statute. (See Cook Decl. Ex. B [Notice to Appear].)

## III.
## DISCUSSION

### A. LEGAL STANDARDS

#### 1. MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, when addressing a motion for summary judgment, this Court must decide whether there exist "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. See id. at 256. Where there is no evidence demonstrating the existence of a genuine issue of material fact, the moving party may prevail simply by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

#### 2. SECTION 1983 CAUSE OF ACTION

To prove a claim under section 1983, Plaintiff must show "(1) that a person acting under color of state law committed the conduct at issue, and (2) that the

4



conduct deprived the claimant of some right, privilege, or immunity protected by the Constitution or laws of the United States." Leer v. Murphy, 844 F.2d 628, 632-33 (9th Cir. 1988). Defendants focus this motion on the second element.

**B. SECTION 1983 LIABILITY OF OFFICERS NEWENHAM AND DESCANT**

    **1. THE OFFICERS HAD PROBABLE CAUSE TO DETAIN SCALLION**

Because the question impacts the analysis for each cause of action, the Court begins by explaining that the officers had probable cause to detain Scallion.

        **a. The Legal Standard**

Probable cause exists when, "under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime." Beier v. City of Lewiston, 354 F.3d 1058, 1065 (9th Cir. 2004) (quoting Grant v. City of Long Beach, 315 F.3d 1081, 1085 (9th Cir. 2002)) (alteration in original). An officer observing criminal conduct may arrest the offender without a warrant, even if the pertinent offense is only a minor one. Tatum v. City & County of San Francisco, 441 F.3d 1090, 1094 (9th Cir. 2006) (citing Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001)). As long as the facts known to an arresting officer are sufficient to create probable cause, the arrest is lawful, regardless of the officer's subjective motivation. Id. (citing Devenpeck v. Alford, 543 U.S. 146, 153 (2004)). In other words, an officer's detention of a suspect is lawful "as long as the circumstances, ***viewed objectively,*** justify that action." Devenpeck, 543 U.S. at 153 (quoting Whren v. United States, 517 U.S. 806, 813 (1996)) (emphasis added). Accordingly, persons are lawfully arrested when "the facts known to the arresting officers give probable cause to arrest." Id. at 155.

        **b. Application**

Here, Officers Newenham and Descant had probable cause to arrest Scallion for not using an illuminated headlight after dark and not displaying her bicycle registration on her bicycle, even though the officers did not cite her for the headlight violation. (See Cook Supp. Decl. Ex. C [Arrest Report] & Ex. D [Probable Cause

Declaration].) California Vehicle Code § 21201(d)(1) provides that anyone operating a bicycle during darkness must be equipped "with a lamp emitting a white light which, while the bicycle is in motion, illuminates the highway in front of the bicyclist." The undisputed evidence establishes that Scallion was stopped well over an hour after sunset, a fact that she does not dispute, and she admits that she did not have her headlight turned on. As defined in the California Vehicle Code, "darkness" is "any time from one-half hour after sunset to one-half hour before sunrise." Cal. Veh. Code § 280. Thus, at the time of the stop it was already dark within the meaning of the statute. Because Scallion admits that she did not have her bicycle headlight turned on, she was in violation of section 21201(d)(1).

In addition, Hawthorne Municipal Code § 10.76.010 requires that anyone operating a bicycle in the City first obtain a license and "affix[] and display[] at all times said license to the front of the seat tube of the bicycle frame." Scallion admits that she did not have a license displayed on her bicycle at the time she was stopped. Based on these undisputed facts, the officers had probable cause to arrest Scallion.

Scallion questions whether the officers knew when they stopped her that her headlight was not on. If not, then they would have lacked probable cause to arrest her. (Opp. at 9-10.) Scallion bases her entire argument on her claim that the officers' "depositions and declarations" assert that she was riding southbound on Doty Avenue, when in fact she admits that she was riding her bicycle northbound on Doty Avenue. Officer Descant's contemporaneous arrest record is entirely consistent with Scallion's assertion. In that report, Officer Descant noted that Scallion was riding her bicycle "northbound on Doty" (Cook Supp. Decl. Ex. C [Arrest Report]), thereby agreeing with Scallion's version of which direction she was riding. Although it appears that Officer Newenham, in an after-the-fact interview, indicated that Scallion was riding southbound, that is not enough to create an issue of fact for trial. The officers' observations occurred so long after sunset that they would have been able to tell whether Scallion had illuminated her headlight regardless of whether she was riding

toward or away from them. Since the entire purpose of a headlight, which shines away from the bicycle rider (or the driver of a car), is to illuminate the path before the rider, the officers would have readily been able to observe whether Scallion's pathway was illuminated or dark even if she were riding away from them.

In sum, the undisputed facts demonstrate that the police officers objectively had probable cause to believe that Scallion had committed a crime, both at the time they stopped her and at the time they took her into custody.

### 2. FIRST AMENDMENT CAUSE OF ACTION AGAINST OFFICERS NEWENHAM AND DESCANT

Scallion alleges that she was arrested because she asked the officers if she was under arrest, thus violating her First Amendment rights. (Opp. at 4-8.)

#### a. The Legal Standard

"[T]he First Amendment protects verbal criticism, challenges, and profanity directed at police officers" unless the speech constitutes fighting words. Gulliford v. Pierce County, 136 F.3d 1345, 1349 (9th Cir. 1998) (citing City of Houston v. Hill, 482 U.S. 451, 461-63 (1987)). To demonstrate retaliation in violation of the First Amendment, an arrestee must demonstrate that the officer "deterred or chilled [the arrestee's] speech and such deterrence was a substantial or motivating factor in [the officer's] conduct." Mendocino Envtl. Ctr. v. Mendocino County, 192 F.3d 1283, 1300 (9th Cir. 1999) (quoting Sloman v. Tadlock, 21 F.3d 1462, 1469 (9th Cir. 1994)). If an officer arrests someone solely for that person questioning a police officer's conduct, without anything more, then that arrest violates the arrestee's First Amendment rights. See Gulliford, 136 F.3d at 1349 (officer arresting plaintiff for telling officer to "pick on somebody [plaintiff's] size violated plaintiff's First Amendment rights); United States v. Poocha, 259 F.3d 1077, 1082 (9th Cir. 2001) (arrestee using profanity to disapprove of officer's conduct not a crime by itself).

Until recently, however, no case held that an officer who had probable cause to place a suspect under arrest could be sued for a violation of the arrestee's First

7

Amendment rights. The Ninth Circuit recently addressed this issue in Skoog v. County of Clackamas, — F.3d —, Nos. 04-35087, 04-35286, 04-35568, 2006 WL 3353985 (9th Cir. Nov. 20, 2006). In Skoog, the Ninth Circuit held that a "right exists to be free of police action for which retaliation is a but-for cause even if probable cause exists for that action." Id. at *10. Nevertheless, the court held that, because this rule was not clearly establish before its November 2006 decision, qualified immunity insulated a police officer from a First Amendment retaliation claim because probable cause existed for his action. Id.

To determine whether a government official is entitled to qualified immunity, the Court asks two questions: (1) was the law governing the official's conduct clearly established, and, if so, (2) could a reasonable official believe his or her conduct was in compliance with the law? Liston v. County of Riverside, 120 F.3d 965, 975 (9th Cir. 1997); see Saucier v. Katz, 533 U.S. 194, 201-02 (2001). Thus, in Skoog, because the right to be free of First Amendment retaliation by a police officer, even if probable cause existed at the time, was not clearly established at the time of the officer's action, the officer was entitled to qualified immunity. Skoog, 2006 WL 3353985, at *10.

**b. Application**

Here, Scallion alleges that the officers arrested her in retaliation for her asking whether she was under arrest. According to Scallion:

A:   The last thing [Officer Newenham] asked me was my name.

Q:   Okay. And what did you tell her?

A:   I asked her if I was under arrest.

Q:   Okay. Why didn't you tell her your name?

A:   Because I felt she had already asked me – I thought it was just – needed to be over.

Q:   And what did she say, if anything, when you responded to her question about your name by saying "Am I under arrest"?

A:   She said, "You are now."

| | | |
|---|---|---|
| 1 | Q: | Okay. And what happened next? |
| 2 | A: | I had to get off my bike and she might have patted me down at that time and she put the handcuffs on me. |
| 3 | | |

(Rutter Decl. Ex. A [Scallion Dep.] 64:3-17.) Scallion argues that the words "You are now" are the equivalent of Officer Newenham stating "I've decided to arrest you because you dared to ask me if you were under arrest." (Opp. at 7.) Even if Scallion is correct, the officers are entitled to qualified immunity under Skoog. As this Court noted above, the officers had probable cause to arrest Scallion and would have had no reason to believe that their arrest of her after she made her statement to them could be grounds for a First Amendment claim, even if her comment motivated them to place her under arrest. Thus, as the arrest in this case occurred before the Skoog decision, the officers are entitled to qualified immunity because Scallion's right to bring the First Amendment claim was "far from clearly established in this Circuit" at the time of Scallion's arrest. See Skoog, 2006 WL 3353985, at *10. Accordingly, the Court **GRANTS** the motion as to this cause of action against Officers Newenham and Descant.

### 3. ILLEGAL SEARCH CAUSE OF ACTION AGAINST OFFICER NEWENHAM

Scallion alleges that she was subject to two separate illegal searches by Officer Newenham, both of which violated her Fourth and Fourteenth Amendment rights. First, she alleges that she was subject to an illegal search at the scene. Second, she alleges that the booking search, specifically the lifting of her shirt that exposed her breasts, was an unlawful strip search. The Court concludes that neither search was unlawful.

**a. The Search at the Scene Was a Search Incident to a Lawful Arrest**

***i. The Legal Standard***

A warrantless search conducted without probable cause and either consent or exigent circumstances is generally presumed unconstitutional. See Florida v. Royer,

460 U.S. 491, 497 (1983). However, officers generally may conduct a search incident to, or immediately following, a lawful arrest. See Chimel v. California, 395 U.S. 752, 763 (1969). A search that precedes a lawful arrest does not violate the Fourth Amendment if probable cause for the arrest exists at the time the search is conducted, even if the arrest has not yet occurred. See Rawlings v. Kentucky, 448 U.S. 98, 111 (1980) ("Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa."); see also Carey v. Nevada Gaming Control Bd., 279 F.3d 873, 881 (9th Cir. 2002) (search incident to a lawful arrest did not violate plaintiff's Fourth Amendment rights because probable cause to arrest existed).

### ii. Application

Here, Officer Newenham declares that "[i]ncident to [Scallion's] arrest, [she] conducted a pat-down search of [Scallion]." (Newenham Decl. ¶ 14.) Scallion alleges that Officer Newenham began to search her by emptying Scallion's pockets as she was questioning Scallion about where she was going, where she lived, and whether she was working. (Scallion Decl. ¶¶ 3-4.) Scallion also states that after Officer Newenham placed her under arrest, she "might have patted [Scallion] down." (Rutter Decl. Ex. A [Scallion Dep.] 64:16-17.)

Scallion argues that the search at the scene violates Terry v. Ohio, 392 U.S. 1 (1968), on the ground that there was no reason to believe that the officers were dealing with an armed and dangerous individual. (Opp. at 8.) However, the Terry stop limitation does not apply because the undisputed facts give rise to probable cause in this case. See Gustafson v. Florida, 414 U.S. 260, 264 (1973) (Terry limitation on protective searches conducted in investigatory stop situation based on less than probable cause not to be carried over to searches made incident to lawful custodial arrests). Whether Officer Newenham emptied Scallion's pockets, patted her down, or both, there is no genuine issue of material fact because these searches

1 | were conducted contemporaneous to the time of her arrest, which was based on
2 | probable cause, as explained above. Because there is no Fourth Amendment
3 | violation for contemporaneous searches, whether immediately before or after the
4 | lawful arrest, see Rawlings, 448 U.S. at 111, the officers' search of Scallion in the
5 | field did not violate her Fourth Amendment rights.

### b. The Police Station Search Was Not Unreasonable

In addition to the search at the scene, Scallion argues that the booking search at the police station, during which her breasts were exposed, was unreasonable because it was an illegal strip search. (Opp. at 12-13.) Officer Newenham, on the other hand, contends that the booking search was a standard inventory search permitted by law. (Mot. at 11-13.)

The Ninth Circuit has held that "strip searches of persons arrested for minor offenses are prohibited by the Fourth Amendment, unless reasonable suspicion exists that the arrestee is carrying or concealing contraband or suffering from a communicable disease." Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 922 (9th Cir. 2001) (citing Karim-Panahi v. LAPD, 839 F.2d 621, 624 (9th Cir. 1988)). However, lifting an article of clothing to reveal undergarments is not necessarily a strip search, which normally entails requiring the arrestee to disrobe. United States v. Palmer, 575 F.2d 721, 723 (9th Cir. 1978) (customs inspector's lifting of a suspect's skirt to reveal whether a girdle worn underneath contained drugs was not a strip search).

Here, it is undisputed that after Scallion stated that she did not know how to remove her bellybutton ring, Officer Newenham approached Scallion and lifted Scallion's baggy zip-up "jacket-type" shirt, thereby exposing Scallion's breasts. (SGI ¶¶ 13, 16-17.) Scallion states in her deposition testimony, "Officer Newenham came up from behind me to see what was going on, to I guess assist me in removing it [the ring]. She pulled my shirt . . . up to see, you know, what I was – why I couldn't [remove the bellybutton ring]." (Cook Supp. Decl. Ex. J [Scallion Dep.] 82:11-12.) In

other words, Scallion herself believed that Officer Newenham approached Scallion to help her remove the ring. Scallion also testified that after Officer Newenham lifted her shirt to expose her breasts, Scallion asked her if she (Officer Newenham) could lower it because she was not wearing a bra. Officer Newenham allegedly responded, "It's not my fault you didn't wear a bra." (Id. at 87:18-21.) Though Officer Newenham may have made an off-hand remark about Scallion's lack of clothing underneath her shirt, Scallion did not testify that Officer Newenham held the shirt for a prolonged period of time. Thus, Officer Newenham's statement does not create a genuine issue of material fact to warrant denial of summary judgment.

However, Scallion presents evidence that Officer Newenham had a different motive in lifting Scallion's shirt. In summarizing an interview with Officer Newenham, Sergeant James Royer writes:

> Officer Newenham said that she performed a standard booking search for a female prisoner, which included **having the area of the breast examined for contraband**. Newenham said that she performed this search on SCALLION and that it was done so that it was not visible to anyone other than Officer Newenham.

(Cook Supp. Decl. Ex. B [Newenham Interview Summary] at 24 (emphasis added).) According to Officer Newenham in the interview summary, she was examining the area of the breasts for contraband, and not just trying to help Scallion remove her bellybutton ring. However, even assuming that Officer Newenham's purpose in lifting Scallion's shirt was to search for contraband in the breast area, there is no evidence to indicate that Officer Newenham knew beforehand that Scallion was wearing nothing underneath her shirt, especially given the fact that it was baggy and looked like a jacket. A reasonable person would assume that there would be extra layers of clothing underneath a jacket-type garment. Moreover, conducting a search of the breast area for contraband does not necessarily constitute a strip search unless Officer Newenham had ordered Scallion to disrobe or knew Scallion was not wearing any clothing underneath. The evidence in the record does not support either assertion. Like Palmer, in which looking underneath a skirt to search for contraband

12

in a girdle was not a strip search, lifting Scallion's shirt to search for contraband in a bra or the breast area does not fall within the definition of an illegal strip search, even though it turned out that Scallion was not wearing a bra. Accordingly, the Court **GRANTS** Defendants' motion as to the illegal search cause of action against Officer Newenham.

### 3. FALSE ARREST CAUSE OF ACTION AGAINST OFFICERS NEWENHAM AND DESCANT

Next, Scallion alleges a section 1983 violation for illegal detention and false arrest. To prevail on a section 1983 claim for false arrest, Plaintiff must demonstrate that there was no probable cause to arrest her. Cabrera v. City of Huntington Park, 159 F.3d 374, 380 (9th Cir. 1998).

Here, Scallion argues that her arrest cannot be justified because it violates California Vehicle Code § 40302(a), which requires that an officer "follow the cite-and-release procedure [for any non-felony violation of the California Vehicle Code], unless the offender fails to present a driver's license or other satisfactory evidence of identity for examination." People v. McKay, 27 Cal. 4th 601, 620 (2002). Here, it is disputed whether the officers asked for any identification from Scallion prior to arresting her. Scallion contends that the officers never asked her for identification (Scallion Decl. ¶ 3), but the officers state that they asked for identification and her name, and that Scallion refused to provide either. (Newenham Decl. ¶¶ 11-12; Descant Decl. ¶¶ 10-11.) It is undisputed that Scallion was not carrying any identification with her at the time of her arrest. (SGI ¶ 8.)

Even though it is disputed whether Scallion was given the opportunity to present identification to avoid a custodial arrest under section 40302(a), that does not negate the undisputed facts that gave the officers probable cause to arrest her. See United States v. Mota, 982 F.2d 1384, 1387 (9th Cir. 1993) ("in the context of a suit brought under 42 U.S.C. § 1983, . . . state law governing an arrest is irrelevant to determining whether the arrest deprived an individual of rights secured by the federal

constitution or a federal statute"). Whether the officers had violated the state law statute pertaining to the arrest itself does not change the Fourth Amendment analysis. In other words, because probable cause existed to arrest Scallion due to her violations of the California Vehicle Code and Hawthorne Municipal Code, Scallion's false arrest cause of action fails. Accordingly, the motion as to this cause of action against Officers Newenham and Descant is **GRANTED**.

### 4. MALICIOUS PROSECUTION CAUSE OF ACTION AGAINST OFFICERS NEWENHAM AND DESCANT

To prevail on a section 1983 claim for malicious prosecution with the intent of denying a person a specific constitutional right, the plaintiff must prove: (1) the initiation of a criminal prosecution that was pursued to a legal termination in the plaintiff's favor; (2) the prosecution was initiated for the purpose of depriving the plaintiff of a specific constitutional right; (3) the prosecution was initiated without probable cause; and (4) the prosecution was initiated maliciously. See, e.g., Freeman v. City of Santa Ana, 68 F.3d 1180, 1189 (9th Cir. 1995); accord Awabdy v. City of Adelanto, 368 F.3d 1062, 1069 (9th Cir. 2004). Malicious prosecution actions are not limited to suits against prosecutors, but may be brought against other persons who have wrongfully caused the charges to be filed. Awabdy, 368 F.3d at 1066.

Here, no criminal prosecution was initiated at all: the prosecuting attorney declined to file criminal charges against Scallion. In addition, as explained above, Officers Newenham and Descant had probable cause to arrest due to violations of the California Vehicle Code and Hawthorne Municipal Code. Thus, Scallion's malicious prosecution cause of action fails against Officers Newenham and Descant, and the Court **GRANTS** the motion on this ground as well.

### C. SECTION 1983 LIABILITY OF THE CITY OF HAWTHORNE, HAWTHORNE POLICE DEPARTMENT, AND CHIEF PORT IN HIS OFFICIAL CAPACITY

Scallion also asserts a Monell claim based on the same causes of action against the City, the Police Department, and Chief Stephen E. Port in his official

14

capacity. While the lack of an underlying constitutional violation of course defeats the Monell claim, the claim also fails on substantive grounds.

### 1. THE LEGAL STANDARD

Local governments are considered to be "persons" subject to liability under section 1983 when official policy or custom brings about a constitutional injury. See Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658, 690 (1978). If a constitutional violation is proven to result from a local government's official policy, practice, or custom, that government or governmental entity may be held liable. See, e.g., Bd. of County Comm'rs v. Brown, 520 U.S. 397, 404 (1997) (citing Monell). However, local governments may not be found liable for the actions of their employees on a garden-variety *respondeat superior* theory. See id.

A plaintiff may establish a Monell claim in one of three ways: (1) demonstrating a "longstanding practice or custom which constitutes the standard procedure of the local governmental entity"; (2) showing that the decision-making official was, as a matter of state law, a "final policymaking authority" whose actions represent official policy in the area of decision; or (3) showing that an official with final policymaking authority "either delegated that authority to, or ratified the decision of, a subordinate." Menotti v. City of Seattle, 409 F.3d 1113, 1147 (9th Cir. 2005) (citing Ulrich v. City & County of San Francisco, 308 F.3d 968, 985-86 (9th Cir. 2002)). A municipal policy "may be inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded." Id. (quoting Nadell v. Las Vegas Metro. Police Dep't, 268 F.3d 924, 929 (9th Cir. 2001)).

To succeed on a ratification theory, a plaintiff "must prove that the authorized policymakers approve a subordinate's decision *and* the basis for it." Christie v. Iopa, 176 F.3d 1231, 1239 (9th Cir. 1999) (citation and internal quotation marks omitted) (emphasis added). "Accordingly, ratification requires, among other things, knowledge of the alleged constitutional violation." Id.

15

### 2. APPLICATION

Here, Plaintiff argues that the City, Chief Port, and the Police Department[4] are liable via ratification. (See Opp. at 15.) Specifically, Plaintiff contends that after Plaintiff's attorney sent a citizen's complaint letter addressed to Chief Port about her alleged mistreatment (Cook Supp. Decl. Ex. A [2/23/05 Letter to Port]), the Police Department's response that the officers' action was "lawful, justified and proper" constituted a ratification of the officers' conduct (id. Ex. E [Royer to Cook Letter]), thus subjecting the City, Chief Port, and the Police Department to Monell liability. (Opp. at 15.) This evidence alone, however, does not establish that the City or Chief Port ratified the officers' allegedly unconstitutional conduct. First, the reply letter to Plaintiff's attorney was signed by Sergeant Royer of the Hawthorne Police Department Internal Affairs Bureau. (Cook Supp. Decl. Ex. E [Royer to Cook Letter].) Scallion has not presented any evidence that Chief Port delegated "final policymaking authority" to Royer, nor has she presented any evidence of affirmative or deliberate conduct by Chief Port that ratified Sergeant Royer's conclusion. See Gillette v. Delmore, 979 F.2d 1342, 1348 (9th Cir. 1992) (official policymaker must make "deliberate choice from among various alternatives to follow a particular course of action" to impose liability on municipality). Thus, Plaintiff has failed to create a genuine issue of material fact because there is no evidence to indicate that Chief Port "ratified" this conduct in his official capacity, thus implicating the City to Monell liability.

In addition, Scallion has not alleged any evidence of a "longstanding practice or custom." Scallion attempts to infer such a policy by arguing that Officers Newenham and Descant testified in their depositions that "their actions in detaining and arresting Ms. Scallion were in accordance with Hawthorne PD policy." (Cook Supp. Decl. ¶ 2B.) However, Scallion fails to provide the Court with actual deposition

---

[4] In her Opposition, Scallion mentions only that the City and Chief Port are liable via ratification and fails to mention the Police Department. Presumably, she meant to include the Police Department here as well.



transcripts, and Scallion's attorney merely summarizes the officers' testimony in his declaration. Such evidence is inadmissible and does not create a genuine issue of material fact with regard to whether a constitutional violation resulted from a policy or custom of the City. Cf. William W. Schwarzer, et al., California Practice Guide: Federal Civil Procedure Before Trial § 14:181.1-.2, at 14-60.11 (2005) (counsel's declaration alone insufficient to authenticate deposition transcript).

Furthermore, though Officer Newenham stated in her interview with Sergeant Royer that her searching Scallion's breasts for contraband was a "standard booking search for a female prisoner" (Cook Supp. Decl. Ex. B [Newenham Interview Summary]), Scallion has not proffered any other evidence to imply that such a search was a "widespread practice" or that these searches were performed repeatedly on individuals arrested for minor offenses. Accordingly, because Plaintiff has failed to provide admissible and sufficient evidence that the City either had a policy or custom that resulted in a constitutional violation, or that a person with final policy-making authority ratified a subordinate's decision and the basis for it, the Monell claim would fail even if an underlying violation did occur.

### D. SECTION 1983 LIABILITY OF CHIEF PORT IN HIS INDIVIDUAL CAPACITY

Plaintiff also sues Chief Port in his individual capacity. To be liable in his individual capacity, Chief Port must have "set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury." Watkins v. City of Oakland, 145 F.3d 1087, 1093 (9th Cir. 1998); Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991). Supervisory liability may be imposed against Chief Port in his individual capacity (1) for his "own culpable action or inaction in the training, supervision, or control of his subordinates," (2) for his "acquiescence in the constitutional deprivations of which the complaint is made," or (3) for conduct showing a "reckless or callous indifference to the rights of others." Watkins, 145 F.3d at 1093; Larez, 946 F.2d at 646.

In Larez, the police chief was found to be liable in his individual capacity because he had signed a letter informing the plaintiff that his complaints of excessive force would not be sustained, when expert testimony demonstrated that he should have disciplined the officers and instituted new police procedures. 946 F.2d at 646. Similarly, in Watkins, the police chief had signed an internal affairs report dismissing the plaintiff's complaint despite evidence of excessive force. 145 F.3d at 1093. His actions were enough to hold him liable in his individual capacity. Id. at 1093-94.

Here, Scallion has not set forth any evidence to create a genuine issue of material fact as to Chief Port's liability in his individual capacity. As explained above, Scallion's rights were not violated, and thus Chief Port cannot be held liable for participating in the deprivation of her constitutional rights where there was no deprivation at all. And even if Scallion's constitutional rights were deprived, there is no evidence that Chief Port himself condoned, ratified, or encouraged any wrongful conduct. Unlike Larez and Watkins, in which the chiefs had signed letters denying the plaintiffs' complaints, there is no evidence that Chief Port himself signed a letter or did anything else to ratify the officers' conduct. Thus, Chief Port cannot be held liable in his individual capacity, and the Court **GRANTS** the motion on this ground.

## IV.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion for summary judgment in its entirety.


IT IS SO ORDERED.

DATED: December 19, 2006

Judge Gary Allen Feess
United States District Court

18